UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

NADINE MARIE SMITH,

                      Plaintiff,

            -v-

JPMORGAN CHASE,

                      Defendant.

------------------------------------------------------------------X

15 Civ. 808 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

      Plaintiff Nadine Marie Smith, proceeding *pro se* and *in forma pauperis*, brings this action against JP Morgan Chase Bank, N.A. ("Chase"),[1] alleging discriminatory termination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* Chase now moves to dismiss Smith's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that Smith previously executed a settlement agreement releasing Chase from any and all liability for her claim, and has failed to exhaust administrative remedies.

      For the following reasons, the Court grants Chase's motion and dismisses the Complaint with prejudice.

**I.     Background**

      **A.     Facts[2]**

      Smith is an African-American woman of Jamaican descent. Compl. 3, 6. Between December 2005 and August 20, 2012, Smith worked as an Assistant Branch Manager at Chase in

---

[1] Chase states that it is erroneously named in the Complaint as "JPMorgan Chase."

[2] The following facts are drawn from Smith's Complaint, Dkt. 2 ("Compl."), and letter in opposition to Chase's motion to dismiss, Dkt. 20 ("Pl. Br."), and the documents attached to or incorporated in both submissions. *See Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001) (when

New York City.  *See id*. at 6, 53; *id.*, Ex. 1, at 26.  On August 20, 2012, Smith was terminated after an internal investigation for a violation of Chase's anti-sexual harassment policy.  *Id*. at 3, 6, 8; Pl. Br. 1.

Smith claims that the purported basis for her termination—that she made sexual comments in the workplace and sent a nude photo to a subordinate—were unsubstantiated and pretextual.  *See* Compl. 6–10. The true reason for her termination, she claims, was that she is African American, and that her branch manager preferred Hispanic employees.  *Id.* at 7, 10.

On or about November 9, 2012, Smith filed charges with the New York State Division of Human Rights ("Division") and the Equal Employment Opportunity Commission ("EEOC"), alleging discriminatory termination on account of her race, in violation of the New York State Human Rights Law and Title VII.  *Id*. at 3, 12, 26–39, 53.

On November 29, 2012, Smith, together with one Florentino Lewis, brought an action against Chase in this District, alleging overtime violations under the Fair Labor Standards Act

---

considering a Rule 12(b)(6) motion to dismiss, a Court may consider documents attached to or incorporated by reference in the complaint); *Pahuja v. Am. Univ. of Antigua*, No. 11 Civ. 4607 (PAE), 2012 WL 6592116, at *1 (S.D.N.Y. Dec.18, 2012) ("[B]ecause a *pro se* plaintiff's allegations must be construed liberally [when evaluating a motion to dismiss], it is appropriate for a court to consider factual allegations made in a *pro se* plaintiff's opposition papers, so long as the allegations are consistent with the complaint.").  The Court also references representations made by Smith at the initial pretrial conference on February 25, 2016.  Citations to "Tr." refer to the transcript of that conference.  However, the Court does not consider the letter from Smith to the New York State Division of Human Rights, attached as Exhibit A to the declaration by Courtney S. Stieber in support of Chase's motion to dismiss, Dkt. 14, Ex. A, because it is neither referenced in, nor incorporated by, the Complaint.

and New York Labor Law (the "FLSA lawsuit").[3] *See Smith v. JP Morgan Chase & Co.*, No. 12 Civ. 8697 (PKC), Dkt. 1 (S.D.N.Y. Nov. 29, 2012).[4]

On April 8, 2013, Smith and Chase entered into a "Negotiated Settlement Agreement and General Release" (the "Agreement"), settling and releasing "any and all claims" Smith had against Chase in exchange for $24,000. *See id*. 57–63; *id.*, Ex. 1, at 1–2 ("Agmt."), ¶¶ 1, 5(b). Smith was represented by her attorney, Christopher Davis, Esq., when she signed the Agreement. *See* Pl. Br. 1; Tr. 4–5.

The Agreement provides, in pertinent part, as follows:

1. JPMC . . . agrees to pay EMPLOYEE and EMPLOYEE's attorney, in the aggregate, the amount of Twenty-Four Thousand Dollars and Zero Cents ($24,000.00) ("Settlement Payment") in settlement of any and all claims that EMPLOYEE has, had, may have or may have had as a result of EMPLOYEE's employment or termination of employment at JPMC, against the following: JPMC . . . .

   * * *

6.
   * * *

   (b)    EMPLOYEE . . . knowingly and voluntarily releases and forever discharges JPMC . . . to the full extent permitted by law, of and from any and all claims, causes of action, agreements, attorneys' fees, costs, and debts, known and unknown, asserted and unasserted, which EMPLOYEE has or may have against any and all RELEASEES as of the date of this Agreement. . . .

   * * *

---

[3] In her opposition brief, Smith states that she joined an "outstanding class action lawsuit against JP Morgan Chase in regards to overtime pay for Sales representatives and Assistant Managers." Pl. Br. 1. However, the documents that Smith attached to her Complaint in this action, including the amended complaint in the FLSA lawsuit, indicate that she was a named plaintiff in that case. *See* Compl., Ex. 1, at 25.

[4] The Court takes notice of the docket and filings in the above-captioned case to establish "the fact of the litigation and related filings." *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (courts "routinely take judicial notice of documents filed in other courts" for these limited purposes).

    (e)    EMPLOYEE hereby represents that, other than the Action listed above, EMPLOYEE has not filed or instituted, or directed any person or agency to file or institute on EMPLOYEE's behalf, any complaints, lawsuits, actions, causes of action, administrative charges, claims, controversies, demands, grievances or proceedings against any RELEASEE, in any forum.  In the event such other complaints, lawsuits, actions, causes of action, claims, controversies, demands, grievances or proceedings against any RELEASEE exist, EMPLOYEE agrees to immediately seek and obtain dismissal with prejudice of such action.

    * * *

    (m)    The Parties agree that this Agreement does not limit either Party's right, where applicable, to file or participate in any investigative proceeding of any federal, state or local government agency.  To the extent permitted by law, EMPLOYEE agrees that if such an administrative charge is made, EMPLOYEE shall not be entitled to recover any individual monetary relief or other individual remedies.

    * * *

14.    This Agreement was the result of negotiations between the Parties and their respective counsel.  In the event of vagueness, ambiguity, or uncertainty, this Agreement shall not be construed against the Party preparing it, but shall be construed as if both Parties prepared it jointly.

    * * *

16.

    (a)    EMPLOYEE acknowledges that EMPLOYEE has attained the age of 40 and understands that this is a full release of all existing claims, whether known or unknown, including, but not limited to, claims for age discrimination under the Age Discrimination in Employment Act.

    (b)    EMPLOYEE acknowledges that EMPLOYEE has read and understands this Agreement and has signed this Agreement voluntarily.  EMPLOYEE further acknowledges that EMPLOYEE has been advised to consult with an attorney of EMPLOYEE's choice before signing this Agreement, in which EMPLOYEE waives important rights, including those under the Age Discrimination in Employment Act.

    (c)    By Executing this Agreement, EMPLOYEE also acknowledges that EMPLOYEE has been afforded at least 21 calendar days to consider the contents, meaning and effect of this Agreement, as well as alternatives

> to signing this Agreement, and has taken advantage of that opportunity to the extent EMPLOYEE wished to do so. . . .
>
> * * *
>
> (f)     EMPLOYEE may revoke this Agreement for a period of 7 calendar days following the date EMPLOYEE executes this Agreement. . . . [T]his Agreement shall not become effective and enforceable until the 7-day revocation period has expired.  EMPLOYEE understands that 7 days after the date of execution of this Agreement, the Agreement shall become effective and, as of that date, EMPLOYEE may not change EMPLOYEE's decision or seek any other remuneration in any form.
>
> **EMPLOYEE UNDERSTANDS AND ACKNOWLEDGES THAT EMPLOYEE HAS AT LEAST 21 CALENDAR DAYS TO REVIEW THIS AGREEMENT PRIOR TO EXECUTION OF THIS AGREEMENT. . . .**
>
> **HAVING ELECTED TO EXECUTE THIS AGREEMENT, TO FULFILL THE PROMISES AND TO RECEIVE THE CONSIDERATION SET FORTH IN SECTION 1 ABOVE, EMPLOYEE FREELY AND KNOWINGLY, AND AFTER DUE CONSIDERATION, ENTERS INTO THIS AGREEMENT INTENDED TO WAIVE, SETTLE, AND RELEASE ALL CLAIMS EMPLOYEE HAS OR MIGHT HAVE AGAINST THE RELEASE PARTIES AS OF THE EXECUTION OF THIS AGREEMENT.**

Agmt. 1–9.

Ten days later, on April 18, 2013, Smith notified the Division that she had "signed a release in connection with [a] prior case" and was "[c]oncerned about the effect on [her] Division complaint."  Compl., Ex. 1, at 37.  On July 9, 2013, the Division issued a determination that there was probable cause to believe that Chase had engaged in unlawful race discrimination.  *Id*. at 12.  The Division scheduled a public hearing for March 24–25, 2014.  *Id.* at 23–24.

On September 9, 2013, February 27, 2014, and March 6, 2014, Chase submitted letters to the Division asking that Smith's charge be dismissed in light of the release provisions in the Agreement.  *Id*. at 52–55; *id.*, Ex. 1, at 45–46, 61–62.  On March 12, 2014, Davis, who did not represent Smith in connection with her administrative charges, *see id.* at 52; Tr. 17, emailed

5

Smith to notify her that he had been contacted by Chase and the Division, and that the Division was preparing to dismiss her case. Pl. Br. 3. He advised Smith that Chase was "more than a little annoyed and the Judge [was] perplexed," because, "[a]s [he] mentioned to [her] numerous times, while [she] [had] the right to file a charge for discrimination with the EEOC following [her] signing of a severance agreement in the settlement of [her] overtime claims, . . . [she could not] recover anything because [she] waived [her] right to damages." *Id*.

On November 3, 2014, the EEOC issued a right to sue letter, indicating that it was dismissing Smith's case because "Charging Party wishes to discontinue the charge." Compl. 5.

## B. Procedural History

On February 3, 2015, Smith filed the Complaint in this case against Chase. Dkt. 2. On January 4, 2016, Chase filed a motion to dismiss on multiple grounds, Dkt. 12, along with a memorandum of law, Dkt. 13 ("Def. Br."), and a declaration by Chase's counsel, Dkt. 14, in support. On February 19, 2016, Smith filed a letter, dated February 11, 2016, opposing Chase's motion. Pl. Br. On February 25, 2016, the Court held an initial pretrial conference. Dkt. 21. On March 7, 2016, Chase replied. Dkt. 22 ("Def. Reply Br.").

## II. Applicable Legal Standard

To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

For the purpose of resolving a motion to dismiss, the Court must accept as true all well-pled factual allegations in the complaint, and draw all inferences in the plaintiff's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

The Court is "obligated to construe a *pro se* complaint liberally," *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), interpreting it "to raise the strongest arguments that [it] suggest[s]," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and citation omitted). However, *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law." *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983) (internal quotation marks and citation omitted). The Court may not read into *pro se* submissions claims inconsistent with the *pro se* litigant's allegations, *see Phillips v. Girdich*, 408 F.3d 124, 127 (2d Cir. 2005), or arguments that the submissions themselves do not "suggest," *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006) (citation omitted).

**III.   Discussion**

The Court first considers Chase's argument that Smith waived her Title VII claim against Chase by executing the Agreement in the FLSA lawsuit. The Agreement's general release provision (the "Release"), which waives "any and all claims" that Smith "has or may have against [Chase]," Agmt. ¶ 5(b), plainly covers this claim. The sole issue, therefore, is whether the Release is valid and enforceable.

Smith does not dispute that she voluntarily signed the Agreement, or that Chase has compensated her pursuant to its terms. She argues, however, that she should nonetheless be able

to bring this lawsuit because she did not understand that the Release extended to her discrimination claim. That argument is unavailing.

Under New York law, "a valid release constitutes a complete bar to an action on a claim which is the subject of the release." *Morefun Co., Ltd., v. Mario Badescu Skin Care Inc.*, No. 13 Civ. 9036 (LGS), 2014 WL 2560608, at *4 (S.D.N.Y. June 6, 2014) (citing *Interpharm v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011)), *aff'd*, 588 F. App'x 54 (2d Cir. 2014) (summary order). An employee will be bound by a waiver of her federal discrimination claims "so long as the waiver is made knowingly and voluntarily." *Laniok v. Advisory Comm. of Brainerd Mfg. Co. Pension Plan*, 935 F.2d 1360, 1365 (2d Cir. 1991) (collecting cases); *accord Kramer v. Vendome Grp. LLC*, No. 11 Civ. 5245 (RJS), 2012 WL 4841310, at *2 (S.D.N.Y. Oct. 4, 2012).

To determine whether a release of Title VII claims was made knowingly and willfully, courts in this Circuit apply a "totality of the circumstances" test. *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 438 (2d Cir. 1998); *Kramer*, 2012 WL 4841310, at *2. In *Bormann v. AT & T Communications, Inc.*, 875 F.2d 399 (2d Cir. 1989), the Second Circuit set out seven factors particularly relevant to this inquiry:

> 1) the plaintiff's education and business experience, 2) the amount of time the plaintiff had possession of or access to the agreement before signing it, 3) the role of plaintiff in deciding the terms of the agreement, 4) the clarity of the agreement, 5) whether the plaintiff was represented by or consulted with an attorney, . . . 6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law . . . [, and 7)] whether [the] employer encourage[d] or discourage[d] [the] employee to consult an attorney, and whether the employee had a fair opportunity to do so.

*Id.* at 403 (internal citations omitted). However, the "*Bormann* factors" are "neither exhaustive nor must all of the factors be satisfied before a release is enforceable." *Laramee v. Jewish Guild for Blind*, 72 F. Supp. 2d 357, 360 (S.D.N.Y. 1999); *accord Mandavia v. Columbia Univ.*, No. 12

Civ. 2188 (JPO), 2013 WL 2391695, at *5 (S.D.N.Y. June 3, 2013), *aff'd*, 556 F. App'x 56 (2d Cir. 2014) (summary order).  "The essential question is a pragmatic one: whether, in the totality of the circumstances, the individual's waiver of his right can be characterized as 'knowing and voluntary.'"  *Laniok*, 935 F.2d at 1368.

Here, the balance of the *Bormann* factors tips decidedly in Chase's favor.

First, Smith's more than six years of experience working as an Assistant Manager at Chase, *see* Compl., Ex. 1, at 26, supports an inference that she was capable of understanding the Release's terms.  "[A] party need not have had a higher education degree or substantial business experience for [the first *Bormann*] factor to weigh in favor of upholding a release."  *Kramer*, 2012 WL 4841310, at *3 (plaintiff had "sufficient intelligence, ability, and experience to be capable of understanding the [r]elease" where she had worked as an editor at a publication company for four years).  Courts in this District have consistently found that plaintiffs with management experience comparable to Smith's were "capable of understanding a straightforward release much like [that] at issue here."  *Prunella v. Carlshire Tenants, Inc.*, 94 F. Supp. 2d 512, 516 (S.D.N.Y. 2000) (plaintiff who served as building superintendent for three years was "capable of understanding the text and ramifications of the stipulation he signed"); *see, e.g.*, *Bachiller v. Turn On Products, Inc.*, No. 00 Civ. 8701 (JSM), 2003 WL 1878416, at *4 (S.D.N.Y. Apr. 14, 2003) ("Plaintiff, who has a High School Equivalency Diploma and who at the time her employment was terminated was an accounts payable clerk, was capable of understanding the Release and the Notice."), *aff'd*, 86 F. App'x 465 (2d Cir. 2004) (summary order); *Reid v. IBM Corp.*, No. 95 Civ. 1755 (MBM), 1997 WL 357969, at *5 (S.D.N.Y. June 26, 1997) ("[P]laintiff's education and business experience—business studies in high school and community college, and 10 years of managerial experience at IBM—is sufficient to warrant the

9

inference that he understood the Release."). The first *Bormann* factor thus weighs in favor of enforcing the Agreement.

Second, Smith had sufficient time to review and consider the Agreement before signing it. By signing the Agreement, Smith "acknowledge[d] that [she] ha[d] at least 21 calendar days to review [it] prior to execution." Agmt. 9 (emphasis omitted); *id.* ¶ 16(c) ("By executing this Agreement, EMPLOYEE also acknowledges that EMPLOYEE has been afforded at least 21 calendar days to consider the contents, meaning and effect of this Agreement, as well as alternatives to signing this Agreement, and has taken advantage of that opportunity to the extent the EMPLOYEE wished to do so."); *see Bachiller*, 2003 WL 1878416, at *3 (plaintiff "cannot reasonably . . . claim" that "she was not given at least 21 days to consider the agreement before signing it," where the "plain terms of the Release" advised her that she would be afforded such time). Courts have found far shorter periods sufficient to satisfy the second *Bormann* factor. *See Mandavia*, 2013 WL 2391695, at *7 (collecting cases holding that "a few days will suffice, . . . and that even a few hours can suffice"); *Evans v. Waldorf–Astoria Corp.*, 827 F. Supp. 911, 913 (E.D.N.Y. 1993) (release valid where plaintiff had access to agreement for only a few hours before executing it), *aff'd*, 33 F.3d 49 (2d Cir. 1994).

Smith nonetheless objects that she was "rushed to sign paperwork [she] was unsure of," and that she did not have "adequate time" to contemplate the Agreement. Compl. 7; Pl. Br. 1–2. In support, she points to an email from Davis, in which he advised her of Chase's final offer for the settlement and urged, "I need to get back to them today because we have a court conference tomorrow which they want to avoid and they are only keeping this offer on the table for TODAY. I need you . . . to agree today if you want to take the deal." Pl. Br. 4. Critically, however, that email was sent on March 7, 2013, 32 days before Smith signed the Agreement. *Id.*

Therefore, Smith necessarily had at least one month in which to contemplate the core terms of the settlement.  *See Prunella*, 94 F. Supp. 2d at 516 (second *Bormann* factor supported enforcing release where "plaintiff had several weeks to ponder settlement even if he did not see the exact terms until the date he signed the agreement"); *Mandavia*, 2013 WL 2391695, at *7 (second *Bormann* factor satisfied where plaintiff had "several hours to review the Agreement, some of whose terms may have been known to him for nearly two weeks").

Moreover, Smith was afforded seven days in which to revoke the Agreement after its execution.  *See* Agmt. ¶ 16(f) ("EMPLOYEE make revoke this Agreement for a period of 7 calendar days following the date EMPLOYEE executes this Agreement.").  That was more than enough time for Smith to reconsider her choice.  *See Kramer*, 2012 WL 4841310, at *3 (collecting cases finding that four days were "sufficient time for a plaintiff to acquaint herself with [a r]elease's terms and make a considered decision") (internal quotation marks and citations omitted).  The second *Bormann* factor, therefore, also weighs in Chase's favor.

Third, Smith's submissions reveal that she, through her counsel, played a role in deciding the terms of the Agreement.  In an email dated March 7, 2013, Davis informed Smith that he "ha[d] been negotiating with [Chase's] lawyers since December for [her]," and believed that he had reached a "very good outcome" for the settlement.  Pl. Br. 4.  Emails dating to December 17, 2012 corroborate that Davis had been negotiating with Chase on Smith's behalf.  *See id*. Br. 4–8.  Courts in this District have held that any "modifications to the terms of [an] Agreement" achieved by a plaintiff's representative "are fairly attributable to [the] [p]laintiff" herself.  *Mandavia*, 2013 WL 2391695, at *8.  Accordingly, the third *Bormann* factor also supports enforcing the Release.

Fourth, the language of the Release is clear and unambiguous.  Paragraph 5(b) plainly states that, upon signing the Agreement, Smith would release Chase from "any and all claims . . . known and unknown, asserted and unasserted, which [Smith] has or may have against [Chase] as of the date of [the] Agreement."  Agmt. ¶ 5(b).  This waiver is reiterated in paragraph 16(a), *see id*. ¶ 16(a) ("EMPLOYEE . . . understands that this is a full release of all existing claims, whether known or unknown, including, but not limited to, claims for age discrimination under the Age Discrimination in Employment Act."), and again, in capital letters and bold type font, immediately above the signature line of the Agreement, *see id*. at 9 ("**EMPLOYEE FREELY AND KNOWINGLY, AND AFTER DUE CONSIDERATION, ENTERS INTO THIS AGREEMENT TO WAIVE, SETTLE, AND RELEASE ALL CLAIMS EMPLOYEE HAS OR MIGHT HAVE AGAINST THE RELEASE PARTIES AS OF THE EXECUTION OF THIS AGREEMENT.**").[5]  Courts have consistently found such language to unambiguously bar plaintiffs from later bringing any claims, including of discrimination, against former employers.  *See Mandavia*, 2013 WL 2391695, at *8; *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002) (enforcing release stating that plaintiff "release[s] and give[s] up any and all claims which [the plaintiff] may have against [the defendant,] . . . including those of which [the plaintiff is] not aware and those not mentioned in this release," because it was "clear and unambiguous" and "written in plain English"); *Baba v. Warren Mgmt. Consultants, Inc.*, 882 F. Supp. 339, 344 (S.D.N.Y. 1995) (enforcing general waiver releasing "all claims" despite plaintiff's claim that she understood waiver to apply only to the claims raised in her prior suit),

---

[5] At the initial pretrial conference, Smith conceded that she had read at least the latter provision.  *See* Tr. 6.

*aff'd*, 89 F.3d 826 (2d Cir. 1995).  The fourth *Bormann* factor thus supports enforcing the Agreement.

Fifth, it is undisputed that Chase encouraged Smith to consult an attorney, and that she did so, before executing the Agreement.  Paragraph 16(b) of the Agreement provides that "EMPLOYEE . . . acknowledges that EMPLOYEE has been advised to consult with an attorney of EMPLOYEE's choice before signing this Agreement, in which EMPLOYEE waives important rights."  Agmt. ¶ 16(b).  And, as noted, Davis represented Smith in connection with the settlement of the FLSA lawsuit.  *See* Pl. Br. 4–8; *see also* Tr. 4–5 (Smith acknowledging that she was represented by Davis at time she signed the Agreement).  Although Smith claims that she did not have "proper legal counseling" because she was rushed to sign the Agreement, her submissions are to the contrary:  They show that she communicated with Davis as to the substance of the Agreement over the course of many months.  *See* Pl. Br. 4–8.  Therefore, the fifth and seventh *Bormann* factors—that the employer encouraged the employee to consult an attorney, and that the employee exercised her "fair opportunity" to do so—also weigh in Chase's favor.  *See, e.g.*, *Kramer*, 2012 WL 4841310, at *4 ("Courts in this district have held that a release's encouragement to consult with an attorney weighs in favor of the agreement's enforceability.") (collecting cases); *Hsueh v. Bank of N.Y.*, No. 05 Civ. 5345 (JSR), 2006 WL 2778858, at *5 (S.D.N.Y. Sept. 26, 2006) (finding release valid in part because it informed plaintiff of the opportunity to consult with counsel before signing); *Baba*, 882 F. Supp. at 344 (dismissing complaint, even though plaintiff "had no part in drafting" the release, where "plaintiff was represented by a lawyer when she agreed to sign the waiver . . . [and] the release clearly expresse[d] the breadth of the release").

Finally, Smith received valuable consideration in exchange for the waiver of her claims

against Chase. Under the Agreement, Smith and Davis received $24,000, of which Smith was to retain $15,899, less applicable withholdings. Agmt. ¶ 1. Given the inherent risks of litigation, and the possibility that Smith may not have prevailed had she gone to trial in the FLSA lawsuit, this sum exceeds "employee benefits to which [Smith] was already entitled by contract or law." *Bormann*, 875 F.2d at 403 (internal citation omitted); *see Bachiller*, 2003 WL 1878416, at *4 (plaintiff's receipt of compensation to which she was "not otherwise entitled" is sufficient consideration for a valid release). Indeed, the Agreement explicitly provides that Smith "would not receive the consideration . . . except for [her] execution of this Agreement and the fulfillment of the promises contained herein." Agmt. ¶ 1. Therefore, the sixth *Bormann* factor favors enforcing the Release.

Despite these considerations, Smith argues that the Release should not preclude her from bringing this lawsuit because she did not understand, at the time she signed the Agreement, that she was relinquishing her right to pursue a discrimination claim. *See* Pl. Br. 1. She argues that she did not knowingly or willfully waive her Title VII claim because "[she] understood [the FLSA lawsuit and her discrimination charges] to be two separate independent cases that would not be hindered by one another." *Id.*

That argument is untenable because the unambiguous language of the Release is "clearly . . . broad enough to encompass liability pursuant to Title VII." *Prunella*, 94 F. Supp. 2d at 517; *see Laramee*, 72 F. Supp. 2d at 361 (where release waived "all claims" against employer, plaintiff could not "avoid its consequences by claiming that she did not understand its terms"). Courts in this District have consistently enforced general waivers over similar objections,

14

holding that a blanket release provision need not specify every claim to which it extends.[6]  And, even if paragraph 5(b) were ambiguous, paragraphs 1 and 16(a), which respectively state that that the settlement was "of any and all claims that [Smith] has, had, may have or may have had as a result of [her] . . . termination of employment at [Chase]," and that the Agreement "is a full release of all existing claims, whether known or unknown, including, but not limited to, claims for age discrimination," unmistakably state that the Release is not limited to claims relating to wage violations.  *Cf. Nicholas v. Nynex, Inc.*, 929 F. Supp. 727, 732 (S.D.N.Y. 1996) (plaintiff's argument that he was unaware he was waiving his right to pursue claims arising out of events that occurred during his employment was "simply untenable" where release explicitly referred to claims arising from plaintiff's "employment or termination of employment").  Indeed, Smith's April 18, 2013 representation to the Division that she was "concerned about the effect [of the Agreement] on [her] Division complaint," Compl., Ex. 1, at 37, suggests that she appreciated the broad scope of the Release.

In defense of her interpretation, Smith argues that her "lawyer did not make [her] aware of the details that would hinder [her] from seeking further justice" for her discrimination claim.

---

[6] *See Prunella*, 94 F. Supp. 2d at 517 (rejecting plaintiff's argument that release waiving "all claims" should not extend to his Title VII claims because it "did not specifically state that he waived any anticipated Title VII claims") (citing *Olin Corp. v. Consolidated Aluminum Corp.*, 5 F.3d 10, 15 (2d Cir. 1993)); *Baba*, 882 F. Supp. at 344 (enforcing general waiver releasing "all claims" despite plaintiff's claim that she understood waiver to apply only to the claims raised in her prior suit); *Laramee*, 72 F. Supp. 2d at 361 (rejecting plaintiff's argument that release was "deficient because it did not identify by name the particular claims she was waiving"); *Simel v. JP Morgan Chase*, No. 05 Civ. 9750 (GBD), 2007 WL 809689, at *3 (S.D.N.Y. Mar. 19, 2007) (rejecting plaintiff's argument that "his claims in this action were not released [by general waiver] because the Agreement, and his claims for overtime pay and sums deducted from his wages, 'dealt with different subjects'"); *Fay v. Petersen Pub. Co.*, No. 88 Civ. 6499 (MBM), 1990 WL 67397, at *3 (S.D.N.Y. May 17, 1990) ("Although at the time of signing plaintiff may have had no inkling that he would bring an age discrimination claim in the future, he should have understood from the language of the agreement that he was giving up 'any known or unknown claims' against the company related to his termination.").

*Id*. at 7.  Instead, she claims, Davis advised her that she "[could] continue with the case with EEOC" and "still pursue [her] charge of discrimination."  Pl. Br. 1.  She argues that "[her] case should not be dismissed due to the fact that [ ] Davis gave [her] inadequate counseling."  *Id.*

This argument fails for a number of reasons.  First, Smith's claim that she was misled by Davis is belied by her own submissions.  In an email dated December 17, 2012, nearly four months before Smith executed the Agreement, Davis advised her that "if we settle, . . . you may still pursue your charge of discrimination but likely will need to waive any damages."  Pl. Br. 8.  And, when contacted by the Division in connection with Smith's March 2014 hearing, Davis stated that he had told her "numerous time[s]" and made it "very clear" that "while [she had] the right to file a charge of discrimination with the EEOC following [her] signing of . . . [the Agreement] . . . [she] cannot recover anything because [she] waived [her] right to damages."  *Id.* at 3.  These representations are consistent with the terms of the Agreement,[7] and do not suggest that Smith would retain the right to initiate a judicial action distinct from her administrative charges.  To the contrary, Davis's statement that Smith may be required to waive her right to damages effectively warned her that the settlement could foreclose the possibility of a lawsuit for monetary relief.  Accordingly, these communications do "not undermine the validity of the Release and, in fact, weigh[] in favor of a finding that the release was knowing and willful."  *Kramer*, 2012 WL 4841310, at *5.

Second, even if Davis had misrepresented the scope of the waiver to Smith, that would not necessarily "render[] the release not 'knowingly and voluntarily' entered into."  *Pampillonia*

---

[7] *See* Agmt. ¶ 5(m) ("The Parties agree that this Agreement does not limit either Party's right, where applicable to file or participate in any investigative proceeding of any federal, state or local government agency.  To the extent permitted by law, EMPLOYEE agrees that if such an administrative charge is made, EMPLOYEE shall not be entitled to recover any individual monetary relief or other individual remedies.").

*v. RJR Nabisco, Inc.*, 138 F.3d 459, 463 (2d Cir. 1998). On this point, the Second Circuit's decision in *Pampillonia* is instructive. There, Pampillonia had entered into a termination agreement with his employer that released the employer from all claims arising from Pampillonia's employment, including any civil rights claims. *Id.* at 462. Pampillonia later argued that the waiver of his age discrimination claims had been involuntary because his employer had erroneously advised him that he could still pursue legal action against the company if he discovered new information subsequent to signing the agreement. *Id.* The Second Circuit rejected that bid. Given its unambiguous language, the Circuit held, the release was knowingly and voluntarily entered into—notwithstanding the alleged misrepresentation. *Id.* at 463.

So, too, here. As discussed above, the plain language of the Release, which Smith had ample time to consider and admits that she read, evinces the parties' unmistakable intent that Smith relinquish *all* claims against Chase, including any Title VII claim, in exchange for the settlement amount. Smith cannot avoid the consequences of this provision by claiming that she was misled as to its scope or dissatisfied with the advice she received from her attorney. *See Laramee*, 72 F. Supp. 2d at 361 (plaintiff could not "avoid [the] consequences [of release] by claiming that she . . . was dissatisfied [with] her attorney").

Moreover, Smith has made clear that she does not intend to return the money she received from Chase in consideration for the Release. *See* Tr. 9–10, 16. She is thus "deemed to have ratified the Release and is thereby barred from challenging its validity." *Tung v. Texaco Inc.*, 32 F. Supp. 2d 115, 118 (S.D.N.Y. 1997) (plaintiff "who accepts and neither returns nor offers to return the consideration he or she has received for consideration for executing a release" is estopped from challenging its validity), *aff'd in relevant part*, 150 F.3d 206 (2d Cir. 1998); *Hewett v. Leblang*, No. 12 Civ. 1713 (PKC), 2012 WL 2820274, at *7 (S.D.N.Y. July 5, 2012)

(refusing to set aside plaintiff's waiver of claims because "[a] settlement agreement is ratified when a party accepts payment thereunder"); *Reid v. IBM Corp.*, No. 95 Civ. 1755 (MBM), 1997 WL 357969, at *10 (S.D.N.Y. June 26, 1997) (applying the "ratification" doctrine to plaintiff's Title VII claims). The Court will not permit Smith "to retain the benefit of the bargain while circumventing her own obligations thereunder." *Hewett*, 2012 WL 2820274, at *7.

In sum, having considered each *Bormann* factor and the totality of the circumstances, the Court finds that Smith knowingly and voluntarily assented to the Release. She is therefore barred from bringing her Title VII claim against Chase. Her Complaint must be dismissed with prejudice.[8]

## CONCLUSION

For the foregoing reasons, Smith's Complaint is dismissed with prejudice. The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 12 and to close this case. The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: September 23, 2016
      New York, New York

---

[8] In light of this holding, the Court has no occasion to consider Chase's alternative basis for dismissal: that Smith has failed to exhaust administrative remedies because she withdrew her EEOC charge.